THE STATE ex rel. CITY OF CARTHAGE, Appellant,
v. PUBLIC SERVICE COMMISSION OF MIS-
SOURI et al.

Division One, April 7, 1924.

1. CONTRACT: Franchise to Construct Railway Tracks: Obligation
to Operate.  A franchise ordinance declaring in its title that it
is an ordinance granting "the right to construct and operate"
street railway tracks and "regulating the manner of constructing
the same," and in its body granting "permission and authority to
construct, maintain and operate" certain railway tracks in the city
and declaring that "the grant herein given shall extend for the
term of forty-nine years," did not constitute a contract obligating
the grantee to maintain the tracks or to operate cars thereon for
forty-nine years, but was permissive as to operation, and the
grantee cannot be compelled to operate unprofitable spur tracks,
constructed under the permission to construct, but since abandoned.

2. ———: ———: ———: Police Power: Unprofitableness.  The pres-
ervation of a street railway threatened with insolvency by losses
from inadequate rates is no more an exercise of the police power
than is a like preservation from like losses that would be caused
by enforced operation of highly unprofitable and costly spur tracks.

3. ———: ———: ———: Implied as Condition of Entering City.
Where the city did not by its franchise ordinance impose upon the
grantee an obligation to operate for a given time street railway

506        SUPREME COURT OF MISSOURI,

State ex rel. Carthage v. Public Serv. Commission.

tracks constructed thereunder, such an obligation cannot be implied from his entry into the city with the city's consent.

4. ———: ———: Police Power: Modification by City.   Under the Constitution (Sec. 5, art. 12) the General Assembly is without power to invest a city with authority to impose a condition upon a public utility which would lessen the State's authority to exercise over the utility the police power of the State; and the power to determine whether the grantee of a street railway franchise shall be compelled to operate spur tracks, which for twenty years have proved a great and continuous source of loss, is a part of the police power.

5. SPUR TRACKS: Discontinuance: Continuous Losses.   The Public Service Commission has power to grant to a street railway company permission to take up its spur tracks upon which is operated an electric car for the sole purpose of carrying passengers from the center of the city to two railroad stations, where the chief purpose of the franchise, which does not impose an obligation to operate, was to secure interurban service and to construct an electric line connecting the city with other cities, and the facts show that the car has been for twenty years operated at a net annual loss of $2500 and that its future annual loss, if its operation is continued, will greatly exceed the losses for past years, no matter how they are operated, and other facts are that the company's interurban lines in this State have in recent years been operated at a constantly increasing loss, and the net income on all its lines, intrastate and interstate, has for seven years averaged less than three per cent.

6. FRANCHISE ORDINANCE: Stipulation in Mandamus Suit: Conceding Away Police Power.   A stipulation entered of record by consent of parties, in a mandamus suit, brought years ago by the city to compel a street railway company to operate an electric car on certain spur tracks, whereby the company consented to do the things the city sought to compel it to do, cannot be invoked to impair the power of the State to grant to the Public Service Commission authority to exercise the police power by granting to the company permission to take up the spur tracks.   The stipulation cannot be more absolute than the franchise ordinance upon which it was based, which was subject to the future exercise of the police power by the State.   Besides, parties cannot by consent revise or amend the police power of the State.

Appeal from Cole Circuit Court.—*Hon. John G. Slate,* Judge.

AFFIRMED.

*Frank R. Birkhead* and *J. D. Harris* for relator.

(1) Before the street car company can be permitted to abandon the service on supposed unprofitable lines it must first satisfactorily show that it has made a bona-fide effort to make the lines profitable, as a condition precedent to such abandonment. Culver v. St. Joseph & G. I. R. Co., P. U. R. 1917B, p. 542, 4 Mo. P. S. C. R. 381; State v. Railroad, 239 Mo. 234. (2) It is the well-settled rule that where the road is profitable as a whole the company may be compelled to operate the entire system including the unprofitable portion; that in order to entitle it to abandon the alleged unprofitable portion, the loss on this part would have to be so great, that it would endanger its ability to operate the entire system. State ex rel. v. Atkinson, 269 Mo. 634; St. Louis & S. F. Railroad Co. v. Gill, 156 U. S. 649, 39 L. Ed. 567; State v. Sugar Land Ry. Co., 163 S. W. (Tex.), 1047. (3) Prior to the location, establishment, and operation of a railroad the company would have the right to change or alter its route; but when its route has been selected and designated, and it has actually constructed its road and begun operation thereof, such right no longer exists. People v. Railroad Co., 120 Ill. 48; Attorney-General v. Ry. Co., 36 Wis. 466; 33 Cyc. 636. (4) The street railroad company is operating under a franchise granted by the city under the provisions of Section 20 of Article 12 of the Constitution. The Constitution denies to the General Assembly the right to locate a street railroad on the streets of the city, but expressly delegated the right to consent thereto to the city. The question then of the street car company's right to occupy the streets with its tracks and car lines is a contractual right that the city has for the promotion and protection of its general welfare. The city has the un-

508    SUPREME COURT OF MISSOURI,

State ex rel. Carthage v. Public Serv. Commission.

doubted right to withhold its consent and to prevent the
street car company from entering its streets. It is not a
part of the police power of the State, for if it were the
State could force the city to grant its consent. The grant
of the city on the one hand and the acceptance and user
by the street car company on the other constitute a con-
tract between them. Grand Avenue Railroad Co. v. Lin-
dell Railroad Co., 148 Mo. 637; Columbus R. P. & L. Co.
v. Columbus, 249 U. S. 399, 63 L. Ed. 669; Vicksburg v.
Vicksburg Water Co., 206 U. S. 496, 51 L. Ed. 1155;
Southwest Mo. R. Co. v. Public Service Commission, 219
S. W. 386. (5) The stipulation signed in the mandamus
suit in the circuit court, in which the street car company
agreed that it was violating its franchise by discontin-
uance of car service over these lines and agreed that the
relators were entitled to the relief prayed for in the peti-
tion, and agreeing to restore the service and permanently
to continue the same, is a solemn obligation resting upon
the street car company with the respect to the operation
of these lines, and that solemn agreement should not be
impaired, but the city should, according to the terms of
the stipulation, be permitted to have the case re-docketed
in the circuit court and the preliminary rule made abso-
lute. The street car company in that case in the stipula-
tion mentioned, placed its own interpretation upon the
franchise contract, construed it to be not merely permis-
sive in character, but imposing upon the street car com-
pany the absolute obligation to operate cars and to fur-
nish service over these lines, and its interpretation in
this respect should not be lightly cast aside, but should
be deemed controlling and binding upon it.

*McReynolds & McReynolds* and *John H. Flanigan* for
applicant.

(1) The opinion of this court on the former appeal
(281 Mo. 52) constitutes the law of this case, and conten-
tions adversely determined by that opinion are not live
questions in the case and will not now be considered. 4
C. J. 1093 et seq.; Mullins v. Mt. Saint Mary's Cemetery

Assoc., 259 Mo. 142. (2) This court was in line with the trend of authority throughout the country when on the former appeal it held that there is nothing in Section 20 of Article 12 of the Constitution to prevent the Public Service Commission from granting relief in the instant case. In a number of states having similar provisions, it is held that such a provision gives to a municipality the privilege of veto as to original construction only, and does not grant any power to make contracts which are not reviewable and remediable by the Public Service Commission. Chicago v. O'Connell, 278 Ill. 591; Cambridge v. Railroad Commissioners, 197 Mass. 574; In re Public Service Commission, 154 App. Div. 587, 139 N. Y. Supp. 982; Wilson Township v. Eastern Transit Co., 258 Pa. 266; Puget Sound Co. v. Reynolds, 244 U. S. 574; Board of Survey of Town of Arlington v. Bay Street Railroad Co., 224 Mass. 473; Salt Lake City v. Utah Light & Traction Co., 3 A. L. R. 715; Quinby v. Public Service Commission, 223 N. Y. 244, 3 A. L. R. 685. This court has determined the matter in the same way in two other cases. St. Louis v. Public Service Commission, 207 S. W. 799; Kansas City v. Public Service Commission, 210 S. W. 381. These authorities are cited as memoranda showing that the former opinion is amply supported by authority. (3) Appellant's first assignment of error attacks the judgment of the circuit court for holding applicant's franchise to be permissive in character. This point was decided adversely to appellant's contention on the former appeal (281 Mo. 52.) The decision on the former appeal was consonant with the decided weight of authority in other jurisdictions. San Antonio Street Railroad Co. v. Texas, 35 L. R. A. 662; State ex rel. Knight v. Helena Power & Light Co., 44 L. R. A. 692; Stiles v. Citizens Street Electric Railway Co., 199 Mass. 394, 19 L. R. A. (N. S.) 865; Public Service Commission v. Philadelphia B. & W. R. Co., 122 Md. 438; Towers v. United R. & Electric Co., 126 Md. 478. (4) Where a railroad operates under a permissive franchise, abandonment of an unprofitable portion of its road may lawfully be permitted. 33 Cyc. 637; Ohio & Mississippi Railroad Co. v. People, 11 N. E. (Ill.)

347; Jack v. Williams, 113 Fed. 823; Bullock v. State, 254 U. S. 513; Brooks-Scanlon Company v. Railroad Commission, 251 U. S. 396; Jones v. Dallas Railroad Co., 224 S. W. (Tex.) 807; State v. Old Colony Trust Company, 215 Fed. 307; Public Service Commission v. Phila. B. & W. Railroad Co., 112 Md. 438; San Antonio St. Railroad Co. v. Texas, 35 L. R. A. 662; State ex rel. Knight v. Helena P. & L. Co., 44 L. R. A. 692; Stiles v. Citizens St. Elec. R. Co., 19 L. R. A. (N. S.) 865.

*L. H. Breuer* and *Frank E. Atwood* for respondents.

(1)   A common carrier cannot be compelled to operate at a loss, apart from statute or express contract. The carrier is entitled to earn its expenses and a fair rate upon its investment. To deny such earnings and to compel performance of this duty would be to take its private property without due process of law, contrary to the Fourteenth Amendment to the Constitution. State v. Eastern Texas Rd. Co., 283 Fed. 593; Budd v. New York; 143 U. S. 517; Smyth v. Ames, 169 U. S. 466; Northern Pacific Rd. Co. v. North Dakota, 236 U. S. 585; Brooks-Scanlon Co. v. Railroad Commission, 251 U. S. 396; Bullock v. Florida, 254 U. S. 513. And, even if the charter be considered a contract, notwithstanding the obligations of such charter contract to maintain and operate the road as a common carrier for the period specified therein, the railroad had the right to withdraw its property from use by the public unless generally used by it and adequately compensated, because in violation of the Fourteenth Amendment. The failure of the public to use the dedicated highway to such an extent as to afford fair compensation amounts practically to an abandonment. Being so, the dedicated use fails, and the railroad ceases to be a public highway. State v. Eastern Texas Rd. Co., 283 Fed. 593. The foregoing principles apply with equal force to a part or branch of a railroad system. ''A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage.'' Brooks-Scanlon Co. v. Railroad Commission,

251 U. S. 399. (2) The Commission had the power and authority to pass upon the application of the railroad company to abandon that unprofitable portion of its business in question. In doing so, it exercised its administrative judgment upon the facts. Such an order, when made by a regulatory administrative body possessed of the requisite power and accustomed to deal with questions of like character, should not be disturbed by the court on review except upon evidence in the record showing unmistakably that its judgment and discretion have been abused. Sec. 10459, R. S. 1919; State ex rel. Power Co. v. Public Service Com., 272 Mo. 645; State ex rel. C. & A. Ry. Co. v. Public Service Com., 275 Mo. 72; State ex rel. Power Co. v. Public Service Com., 287 Mo. 522. Proceedings of this character ''reach the Supreme Court with the presumption of right action and as prima-facie valid.'' State ex rel. Wabash Rd. v. Public Service Com., 271 Mo. 155.

JAMES T. BLAIR, P. J.—This is an appeal from a judgment of the circuit court affirming an order of the Public Service Commission which granted leave to respondent Southwest Missouri Railroad Company, an electric line, to take up two short spur tracks.

The ordinance under which the spurs in question and other tracks were built in Carthage was passed in September, 1894. The testimony shows that the main purpose at the time was to secure the coming into Carthage of an interurban line which would connect it with other cities in the county and section. The ordinance, so far as it is relevant to the questions raised by appellant, is as follows:

''An ordinance granting to F. H. Fitch, his heirs, assigns and lessees the right to construct, operate and maintain over certain streets and alleys of the city of Carthage, an electric railway, and regulating the manner of construction of the same, and also the right to erect poles and wires for electric lighting purposes.

"Be it ordained by the council of the city of Carthage, Missouri, as follows:

"Section 1. That permission and authority are hereby granted and given to F. H. Fitch, his heirs, assigns and lessees, to lay down, maintain and operate a street railway, for the carrying of passengers and mail and express matter in said city, with all the necessary side tracks, turn-outs and switches, over, upon and along the following streets, avenues and alleys in the city of Carthage, Jasper County, Missouri, to-wit:"

(Several streets and lines are then described. These include those along which the interurban cars arrive and depart, the two on which the spurs in question are built, and other lines in the city on which no tracks have ever been built). The section contains provisos concerning (1) the required assent of a majority of property owners along streets described; (2) time when work shall commence; (3) time within which one and one-half miles of track must be put in operation, or city may remove all tracks then laid.

Section 2 describes motive power, and the kind, character, erection, position and manner of maintenance of poles and wires. Section 3 describes types of rails to be used, the gauge, grade and number of tracks and the paving along tracks laid. Section 4 deals with the use and occupancy of streets during the construction period. Section 5 regulates the kind and equipment of cars and their operation. This includes schedules. Section 6 deals with fares. Section 7 reserves the right to order temporary removal of tracks and the taking down of poles and wires when a public purpose or necessity may require. Section 8 provides a means of enforcing the obligation to pave along the track.

"Section 9. The grant herein given shall extend for the term of forty-nine years from the passage hereof, provided the same shall be accepted by the said grantee, his heirs, assigns or lessees within forty-five days after its passage."

Sections 10 and 13 provide for the indemnification of the city from damages and the like, for which it might

become liable by reason of the grant or operations under it.

"Section 11. In consideration of the granting of the right and franchise to build and operate a railroad in the city of Carthage as contained in this ordinance and such franchise is granted in consideration that said F. H. Fitch, his heirs, assigns or lessees in addition to building such street railroad in the city of Carthage and within one year after the acceptance of this ordinance—time to be the essence of the contract—shall build, construct, operate or shall cause or procure to be built, constructed and operated, an electric rapid transit railroad from the city of Carthage, from some point on the street railroad to be built in the city of Carthage as provided in this ordinance, to the city of Carterville or Webb City, Jasper County, Missouri; and electric cars shall be regularly operated and run on said last mentioned electric rapid transit railroad to be built in the city of Carthage as aforesaid, between said city of Carthage and some point or points within the corporate limits of said city of Carterville or Webb City. And in further consideration of granting this franchise for said street railroad, as indemnity and liquidated damages for a failure to comply with terms, conditions and privileges granted by this ordinance, said grantee, his heirs, assigns and lessees, at the time of filing of the written acceptance of the conditions of this ordinance, as provided in Section 17 hereof and as a part of such acceptance, shall deposit with the city treasurer, of the city of Carthage, the sum of three thousand dollars in good faith and lawful money of the United States, and the acceptance shall not be complete and no rights shall be acquired without said deposit.

"Said three thousand dollars shall be held by said city treasurer and in case said F. H. Fitch, his heirs, assigns or lessees shall build and operate said electric street railroad in the city of Carthage, in the manner and within the time limited in the ordinance and shall comply with the terms thereof, and shall in addition also build said electric rapid transit railroad from the city of Carthage

303 Mo. Sup.—33

to the said city of Carterville or Webb City as heretofore in this section provided, and within the time above limited for the building thereof; said money, so deposited, shall on the order of the city council of the city of Carthage, be repaid to said grantee, his administrators and assigns, but if for any reason said electric street railroad, to be built in the city of Carthage, shall not be built and operated within twelve months as provided in Section 1 of this ordinance, or said electric rapid transit railroad from a point on said street railroad, in the city of Carthage, shall not be built and operated to said city of Carterville or Webb City in accordance with the provisions of this section and within one year as herein limited—time to be the essence of this contract and franchise—then said sum of three thousand dollars shall be held and retained by the city of Carthage and by said city treasurer appropriated and paid into the general revenue fund thereof as liquidated damages, on account of such failure and default, in addition to the other penalties and forfeiture provided by the conditions of this ordinance and without reference to whether or not said city council declares by ordinance the forfeiture of any of the rights or privileges granted by this ordinance.''

Section 12 provides for forfeiture of the franchise in case of failure to comply with proviso (3) of Section 1. Sections 14, 15, 16 and 17 relate to an electric light, heat and power franchise. Section 18, the last section, provides for forfeiture for failure of grantee to accept and file bond within forty-five days.

The first interurban car came into Carthage August 28, 1895. Five or six months later the two spurs, one to the Frisco depot and one to the old Missouri Pacific depot, were completed. One is three-eighths and the other about five-eighths of a mile in length. These are the distances from the square to the Frisco depot, and the former Missouri Pacific depot, respectively. The latter has now been moved about a thousand feet farther north and is that distance from the end of the spur. A light car was operated on the spurs for about twenty years.

It is established by the evidence and found by the Public Service Commission that the average *annual* loss on the operation of these two spurs, which constituted one mile of track, exceeded $2500. The total loss for the period, therefore, exceeded $50,000. The appellant in its brief admits the evidence conclusively shows a loss in operating the spurs. A compilation for the years 1912, 1913, 1914 and to June 17, 1915, shows that the receipts totaled $4185.10, and the wages at that time of the two motormen required by the service aggregated $5005.45. It was shown that from June 1 to June 17, 1915, inclusive, the average daily loss on operation, *exclusive of interest and depreciation,* was $7.57. The *annual* loss at that rate, with like exclusions, would exceed $2700. The direct testimony and the showing for other periods proved that these seventeen days were typical of the whole period of operation. The amount of interest and depreciation fairly chargeable to the spurs seems not to have been given, though it must have added materially to the annual loss. It was shown that the company has not operated the spurs since June 17, 1915, which is about the time the first application to the Commission was filed. It was shown that motormen's salaries had increased one hundred and fifty per cent. This would add six dollars per day, or nearly $2200, to the annual cost of operation. The evidence showed that it would require about $12,000 to put the spurs and equipment into operative condition, and about $3000 to extend the Missouri Pacific spur to the new depot. At six per cent this would add an annual charge of $900. When to these are added other items of expense, which under cheaper conditions in 1912-1915 amounted to 4.7 cents per car-mile and the additional cost of operation due to the lengthening of one of the spurs, which will be essential if traffic from the Missouri Pacific depot is to be secured, it is probable that an income substantially in excess of $20 per day would be required to meet all these charges. There was direct testimony that a daily income exceeding $24 per day would be necessary for that purpose. The evidence shows that in 1918

the income on the company's entire business in Missouri lacked $42,072 of meeting the expenses of the Missouri lines. The income on the whole system exceeded expenses on the whole by less than one per cent on the capital. In 1919 there was a loss of $35,761 on the Missouri lines. On the system as a whole net income fell short of 3.8 per cent. In 1920 the loss in Missouri was $21,514. On the whole system the net return was about 4⅓ per cent. For the nine months ending May 31, 1921, the loss in Missouri was $87,570, and on the Kansas and Oklahoma lines $2124, or a loss on the system of $89,694. Dividends were paid as follows: 1915, 4 per cent; 1916, 5 per cent; 1917, 2 per cent; 1918, 0 per cent; 1920, 3 per cent; 1921 (Jan. 1), 3 per cent.

Appellant offered evidence which it contends supports its contention that the spurs were operated in a manner which prevented the securing of traffic and the building up of business for them. The ordinance schedule was a thirty-minute one. Several witnesses testified that the cars did not run with any sort of regularity and citizens who might desire to use them found them undependable as to times of their trips. Some said the cars would stand on the corner and one who desired to use them would find the motorman in a picture show nearby and would be compelled to summon him. Others complained that the car was not always at the proper depot when trains arrived at Carthage. It does appear from the testimony of appellant's witnesses that it would not be possible to arrange a thirty-minute schedule which would enable the car to meet all trains arriving in and departing from Carthage. In fact, it is shown that the number of trains on the two roads and their times of arrival and departure are such that no schedule could well be arranged to care for them all with but one street car. This is particularly true in view of the evidence that the trains were not usually closely on schedule time. It was also shown by these witnesses that the custom was for the cars to be summoned specially to take a passenger from the square or bring one to the square

between scheduled runs. In fact, some of the complaints made are that sometimes the motorman refused to operate the car in this way. Some witnesses seemed incensed about this. It also was shown by these witnesses, on cross-examination, that many of the people along the spurs were in the habit of walking the short distance to and from the square, as might be expected; that during the last few years of the operation of the spurs jitney cars were operated in competition with them, which first charged a five-cent fare, which was subsequently raised to ten cents before the operation of the spurs was abandoned; that the growth of the town is mainly on the opposite side of the square. According to census the population has increased a little less than seven per cent in twenty years. The agents of the railroads were called and the effect of their testimony was that the average number of outgoing and incoming passengers (this last is estimated) on the two railroads per day was 257. This average included a little of the period of quarry work on the stone for the new State Capitol, and covered the time of mobilization, war and demobilization. When asked about it the witnesses were of the opinion that not all who arrived and departed by trains would ride the short distances the spurs covered and, further, that not all who did ride would use the spur-lines car rather than the competing jitneys or private transportation available. The evidence of appellant shows that the Missouri Pacific spur could in no event be operated profitably without extending it to the new depot.

The spurs were constructed some months after the completion of the main line. It is inferable that an effort was made to operate them by use of the main-line cars and that this proved impracticable. In March, 1896, the company decided to remove the spur tracks, poles and wires thereon. On March 10, 1896, the city instituted a proceeding by mandamus to compel the company to operate and maintain the spurs. On March 16, 1896, a stipulation was filed in that case which admitted the city's right of action and that it was entitled to the relief prayed

and that the defendant consented to do the things the city sought to compel it to do. It was then stipulated that the company should have one hundred days in which to "procure the necessary cars properly to equip and operate said lines of street railway" on a thirty-minute schedule for fifteen hours per day. If the company failed to comply within one hundred days a peremptory writ was to issue. If it did begin operating as stipulated, then the cause was to be continued generally, but might be re-docketed if at any future time the company failed to operate the cars as stipulated; "and that on said failure and re-docketing of said cause, the court shall forthwith render its decree, requiring defendant company to maintain and operate" the spur tracks as stipulated. Other provisions are designed to confer jurisdiction on the Joplin division of the court in case that at Carthage was not in session when need should arise. It does not appear that any subsequent order has ever been made in this proceeding.

Appellant contends: (1) The franchise is not permissive, but imposed an obligation to operate for forty-nine years; (2) Section 20 of Article X of the Constitution deprives the Legislature of power to authorize the Public Service Commission, without the city's consent, to make the order under review; (3) "the court erred in holding there was no public demand or necessity for the operation of said tracks;" (4) no good-faith effort to make the operation of the spurs profitable has been made by the company; (5) the company was concluded by the stipulation in the mandamus suit.

I. Appellant insists that the franchise ordinance and its acceptance constituted a contract which obligated the company to operate the spur tracks for forty-nine years.

Obligation to Operate.

(1) The spurs were built under a franchise the chief purpose of which was to secure interurban service. The grant of the right to occupy the city streets was given in consideration of an obligation to construct a line connect-

ing appellant city with other cities. The spurs were authorized and constructed under a specific and separate franchise description. Their construction and operation and the nature of the service contemplated over them were obviously different from that of the main-line tracks which were designed to carry and which did and do carry the interurban cars and service. They clearly constitute in legal contemplation a separable "location" when considered with relation to that part of the franchise which authorized the main or interurban-line tracks, construction and operation.

The franchise ordinance contains no language which expressly obligates the company to operate for any fixed period of time. The title describes the ordinance as one "granting  .  .  .  the *right* to construct and operate" tracks in the city "and regulating the manner of construction of the same, and also the *right* to erect poles and wires for electric lighting purposes." The ordinance itself merely ordains "that *permission and authority* are hereby granted" to construct, maintain and operate certain tracks. When the council came to the matter with respect to which they desired to impose an obligation as a condition of retention of rights under the ordinance, they were at no loss for apt words to that end, as the provisos in Section 1 show, but none of these has reference to any period of operation. The same thing appears with respect to the regulations and rates which are to govern during whatever time the roads are operated. They obviously have no bearing upon the time of operation, but simply regulate operations while they are carried on. With respect to time, all that appears is in the clause that "the *grant* herein given shall extend for the term of forty-nine years from passage hereof, provided the same shall be accepted  .  .  .  within forty-five days after its passage." This clause in Section 9 adds nothing to "*the grant* herein" (in the ordinance) "given," but necessarily refers to other provisions for the determination of what "the grant" is. As already shown, the passages which define "the grant" describe it as "a right,"

and as "permission and authority" to construct and operate the lines described. It is, therefore, obvious that these are the things given by "the grant" and, consequently, the things which, under Section 9, "shall extend for the term of forty-nine years." Neither expressly nor by reasonable inference does the ordinance render obligatory the operation of the spurs for the forty-nine year period. The decisions relied on by appellant in this connection may be noted. In Grand Ave. Ry. Co. v. Lindell Ry. Co., 148 Mo. l. c. 644, 646, and cases cited, it was held that when a street-car company accepted St. Louis charter provisions which provided that one street-car company might connect its tracks with that of another and operate its cars over them on payment of just compensation, "such acceptance created a contract between the city and such company" which could be enforced in the courts. That principle is not relevant to the present question. The charter and its acceptance clearly gave the complaining company an easement for the benefit of the public (Union Depot Ry. Co. v. Southern Ry. Co., 105 Mo. 572), and the enforceability of this right was not open to question. The decision which is appellant's chief reliance is that in Columbus Ry. & Power Co. v. Columbus, 249 U. S. 399. In that case the question was with respect to the right of the company to increase fares. The right of Ohio cities under statutes of that state to enter into binding contracts on that subject had previously been affirmed in Cleveland v. Cleveland City Ry. Co., 194 U. S. 517 (and decisions of the Ohio courts), and that decision underlies that in the case now cited. In the Columbus Case the company had accepted and operated for seventeen years under two ordinances which fixed fares and service and which *expressly obligated* the company *"during the life of the franchise"* (twenty-five years) "to furnish adequate and efficient service and first-class, commodious cars for the accommodation of its patrons" and "to pay the city two per cent of the gross receipts from local passenger fares *during the term of the franchise."* It was held that the company was bound by these con-

tracts which were authorized by the Ohio law and were not offensive to the Federal Constitution. [Vicksburg v. Vicksburg Water Works Co., 206 U. S. 496.] The complete dissimilarity between the question involved and the language of the ordinances in that case and of the ordinance in this renders manifest the inapplicability of that decision to the question now before this court.

On a former appeal, this court, though holding on one branch of the case that the question was not presented, did, in considering certain views advanced, assume the presence of the question, and held that the ordinance was permissive as to the time of the grant, though obligatory, so far as our law permitted, as to rates, service and like matters during the time of operation. Whether or not that expression of views is to be called *obiter*, it has the support of the weight of authority in decisions dealing with like situations. In San Antonio Street Ry. Co. v. State ex rel. Elmendorf, 90 Tex. 520, the Supreme Court of Texas reversed a holding of the Court of Appeals that a street railway could be compelled to operate a part of a line it had abandoned under a charter which, in so far as it concerns the present question, was like the franchise ordinance in the case at bar. The authorities are cited and discussed and the charter held permissive. In State ex rel. Knight v. Helena Power & Light Co., 22 Mont. 391, and in York & N. M. R. R. v. Railroad, 1 Ell. & Bl., 858, a like principle is approved. In circumstances like those in this case these decisions are further to the effect that, so far as the franchise or charter is concerned, a company which is operating under a permissive grant is not bound to continue the operation of parts of track like these spurs when it is shown such operation has for twenty years proved a great and continuous source of loss, and also shown that there is no reasonable ground to expect improvement in that respect, and that the lines constitute a continuing burden on a system which as a whole, in the state, is losing money and, state and interstate, habitually falls far short of paying a fair return on capital employed. The case of Stiles v. Citizens Elec. Street

Ry., 199 Mass. 394, 19 L. R. A. (N. S.) 865, discusses questions and decisions pertinent here. [See Public Service Comm. v. P. B. & W. Railroad Co., 122 Md. l. c. 444.]

(2) The relation of the constitutional provision, already mentioned, to this case was considered on the former appeal. That ruling is now the law of the case. It was then (281 Mo. l. c. 63) said: "There is no contention possible that Section 20 of Article 12 expressly provides that a street railway, properly admitted into a city, cannot be permitted by the State to take up an unprofitable portion of its tracks. All that could be *claimed* is that the city can impose such condition as the price of its consent or that such condition is necessarily implied." As to the first of these it has already been pointed out that no such condition was imposed by the city. With respect to the second member of the alternative stated, it was said (281 Mo. l. c. 64): "So far as concerns the question of implying a condition from the grant of the right to enter, it is manifest none can be implied in contradiction of the terms of the franchise ordinance." It was further said in the same connection (281 Mo. l. c. 69) that while the city had the right to impose conditions as a price of entrance by street car company, that right was not expressly given, but was implied; that there was, however, no implied power to impose conditions upon consent which would "limit, control or interfere with the police power or its exertion in the regulation of street railways," and authorities were cited which support that position, as reason supports it. Under our Constitution the rule in the Vicksburg Water-Works Case (supra) has no place, as was held in State ex rel. v. Public Service Commission, 275 Mo. 201, and reiterated in several decisions. Manifestly the courts cannot imply a power, like that contended for, to impose a condition in direct conflict with an express constitutional provision, such as Section 5 of Article 12. In City of St. Louis v. Public Service Commission, 207 S. W. (Mo.) 799, in an opinion by Woodson, J., will be found a collection of the decisions and discussion of per-

*Police Powers.*

tinent questions. It is clear that the power to compel the operation of a line or part of line is one which arises out of the public interest with which the service is clothed and is derivable solely from the police power of the State. The preservation of a utility threatened with insolvency by losses from inadequate rates is no more an exercise of the police power than is like preservation from like losses from another source, i. e. the enforced operation of highly unprofitable and costly spur lines. The purpose in each case is to preserve the utility for the public use so far as in the circumstances may be done. The particular source of its losses is of no consequence. That may have to do with the character of the relief, but does not change or affect the nature of the power through whose exertion alone relief can be given.

It appears, therefore, that the city did not impose any obligation to operate for a given time; that no such obligation can be implied from entry into the city by the city's consent; and that the Legislature would be without power, under Section 5 of Article 12 of the Constitution, to invest the city with power to impose any condition which would modify or lessen the State's authority to exercise over the utility the police power of the State in its full scope; and that the power to determine whether the spurs involved in this case, in all the circumstances, must continue to operate, is a part of the police power of the State.

The Public Service Commission has been authorized to act in the premises. Its finding that the spurs lawfully may be permitted to be abandoned is, as a legal proposition, well supported by numerous authorities cited in the briefs. In fact, an effort to compel a continuance of operation in this case, under the facts in evidence, probably would bring the ruling into conflict with the Constitution of the United States. [Brooks-Scanlon Company v. Railroad Comm. of Louisiana, 251 U. S. 396.] The cited decisions in which particular services, though themselves unprofitable, were required to be continued in the absence of a showing as to the profitableness of the whole service are inapplicable to this case,

II.   The evidence shows that, when everything, is considered, an income of about $24 per day would be required to enable the company to come out even on the operation of the spurs.   This would require the equivalent nearly of 500 fares per day at the full ordinance rate for adults and ignores the half fare for children.   The typical return in June, 1915, showed 32 fares and 11 transfers in one day.   There has been no such change of population as to indicate any considerable increase from that source.   If every person who came to Carthage and every one who left by rail rode on the spur cars, only about half the required number *could* come from that source.   Of course, nothing like such unanimous use of the cars is reasonably to be expected. From the number are to be deducted those who walk the short distances to and from the depots, those who have their own transportation, and those who use the "jitney cars" and taxicabs running in the city, and the number who help make up the total but who get off of one train, buy a ticket on another branch of the road and never have occasion to use a street car in either direction.   There is nothing to show any reasonable probability of such future use of the spur car by others than incoming and outgoing passengers as to add very many to the enumeration of probable fares.   It is too clear for dispute that the future annual loss on these spurs, if their operation is required, will greatly exceed the previous loss during twenty years of operation of more than $2500 per annum, no matter how they are operated.   The Commission refused to add this additional loss to the annual deficit of the lines in Missouri and the 1921 deficit on the system as a whole.

*Losses in Operation.*

III.   The stipulation in the mandamus case cannot be invoked to shorten the legislative arm when it is extended in the exertion of the police power.   The Commission (12 P. S. C. Rep. l. c. 138) well said: "The stipulation relates back to the terms of the franchise, is founded upon the franchise, and, for the purpose here involved, cannot be more absolute than the franchise."   No

*Stipulation in Mandamus Suit.*

judgment was entered. Without regard to that, the parties cannot revise and amend the police power of the State by stipulation.

The order of the Commission was right. The judgment affirming it is itself affirmed. All concur.