STATE of Missouri ex rel. CHICAGO, ROCK ISLAND & PACIFIC RAIL-ROAD COMPANY, Appellant,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent.

No. 46338.

Supreme Court of Missouri,

En Banc.

April 14, 1958.

Rehearing Denied May 12, 1958.

O. L. Houts, Chicago, Ill., Lester G. Seacat, Jefferson City, Hale Houts, Hogsett, Houts, James, Randall & Hogsett, Kansas City, for relator-appellant Chicago, R. I. & P. R. Co.

Glenn D. Evans, Gen. Counsel, Howard L. McFadden, Jefferson City, Harry H. Kay, Eden, of counsel, for respondent, Public Service Commission.

HOLLINGSWORTH, Judge.

This case comes to the writer on reassignment following transfer to Court en Banc.

The Chicago, Rock Island and Pacific Railroad Company, hereinafter referred to as "the company", has appealed from a judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission of Missouri, hereinafter referred to as "the commission", denying the company's application for authorization to discontinue its trains numbered 23 and 24 operating between Kansas City, Missouri, and Eldon, Missouri. The application alleged that public convenience and necessity no longer required the operation of these trains; and that their operation resulted in an annual out-of-pocket loss to the company in excess of $50,000, thereby imposing undue burden upon interstate commerce in violation of Article I, § 8, Clause 3, of the Constitution of the United States, and depriving the company of its property in violation of § 1 of the 14th Amendment of said Constitution and of Article I, § 10, of the Constitution of Missouri, V.A.M.S.

It is here contended that the decision of the commission finding that public convenience and necessity required that the operation of said trains be continued and denying the application to discontinue their operation is not supported by competent and substantial evidence upon the whole record; that it could not have been reasonably made upon consideration of all of the evidence and is contrary to the weight of the evidence and the overwhelming weight

thereof; and that it is violative of the constitutional provisions above set forth.

Prior to determining the appeal on its merits, we are confronted with the necessity of a reconsideration of the proper scope of our review of orders of the Public Service Commission. The company insists that in reviewing this cause on appeal we are required by statute to weigh and determine the evidence "as a suit in equity"; whereas, the commission insists that neither the circuit nor appellate courts are empowered to weigh the evidence upon which the commission or any other administrative agency of this state, after due hearing, has based a decision or order, and that judicial review in such cases is limited to determination of whether the decision or order under inquiry is reasonable and lawful. Admittedly, there has been confusion and inconsistency in our prior decisions dealing with this phase of administrative procedure.

When the public service commission law was enacted in 1913, the provisions relating to judicial review of orders and decisions of the commission were set forth in what is now Section 386.510 RSMo 1949, V.A.M.S. (All statutory references are to RSMo 1949, V.A.M.S., unless otherwise stated.) By that section, a writ of review may be obtained from the circuit court "for the purpose of having the reasonableness or lawfulness of the * * * order or decision * * * inquired into or determined." There the cause is heard by the court without intervention of a jury, "on the evidence and exhibits introduced before the commission * * *." The jurisdiction of the circuit court (other than to remand for the taking of testimony improperly excluded by the commission) is expressly limited to the affirmance or the setting aside of the decision under review. The clause of Section 386.510 that has given rise to most of the confusion is the herein italicized portion of the last sentence thereof, reading: "The circuit courts of this state shall always be deemed open for the trial of suits brought to review the or-

ders and decisions of the commission as provided in the public service commission law *and the same shall be tried and determined as suits in equity."* (Emphasis ours.)

As late as 1928, this court construed that clause to mean that neither the circuit court nor the appellate court on appeal was bound by the findings of the commission, nor was the appellate court bound by a finding of the circuit court. State ex rel. and to Use of Pugh v. Public Service Commission, 321 Mo. 297, 10 S.W.2d 946, 948. However, in 1929, in State ex rel. Detroit-Chicago Motor Bus Co. v. Public Service Commission, 324 Mo. 270, 23 S.W.2d 115, 117, hereinafter referred to as the "Detroit-Chicago Motor Bus case", this court, in an opinion by Ragland, J., said:

"It is true that all orders of the commission are subject to judicial review, and that suits brought for such review must be 'tried and determined as suits in equity.' But, after the chancellor has made his own finding of the facts, the only application he can make of them is to determine from them whether the order under review is reasonable and lawful. If he finds it both reasonable and lawful it is his duty to affirm it; if he finds it either unreasonable or unlawful, he must set it aside."

Thereafter, we seem uniformly to have ruled that our review of the orders and decisions of the commission was confined to the question of their lawfulness and reasonableness. In the recent case of State ex rel. Kansas City v. Public Service Commission, 362 Mo. 786, 244 S.W.2d 110, 116, we said that the provision requiring "the trial of suits brought to review the orders of the commission shall be tried and determined as suits in equity, does not confer general equitable power upon the reviewing court."

In the interim between the Detroit-Chicago Motor Bus case, supra, and the last mentioned case, the framers of the 1945

Constitution placed therein an entirely new provision, Article V, § 22, relating to judicial review of the decisions of administrative agencies, wherein it was declared that such decisions "shall be subject to direct review by the courts as provided by law; and such review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record."

The debate upon the adoption of Article V, § 22, reveals somewhat dramatically the reason for the specific provision above quoted. As originally introduced, the proposal with reference to judicial review (Page 2675 of the proceedings of the Constitutional Convention) contained the phrase:

"* * * And such review shall include the determination whether such decision, order, finding, or rule *is based upon the weight of the evidence* and is authorized by law." (Emphasis ours.)

Following introduction of that proposed provision, Senator Allen McReynolds offered an amendment (Page 2683) excluding review based upon the weight of the evidence and incorporating the phraseology thereafter adopted. During debate of the proposed amendment, Sen. McReynolds was interrogated and answered as follows (Page 2694):

"Mr. Moore: If the appellate court was allowed to consider the whole record, what is wrong with requiring them to weigh the evidence?

"Mr. McReynolds: Everything, you substitute then the judgment of the court and it becomes the administering body. Whenever you do that, you destroy administration."

Following adoption of the constitution, we held the scope-of-review provision of Article V, § 22, to be a mandatory and self-enforcing provision fixing the minimum standard of judicial review of administrative decisions therein specified. At the same time, we further declared, however, "This does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal." Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647, 649. In 1945 (Laws 1945, page 1504, Chap. 536 RSMo 1949, V.A.M.S.), the Legislature enacted the first comprehensive legislation relating to Administrative Procedure and Review in this state. The provisions of that act relating to judicial review of the orders and decisions of administrative agencies are found in Sections 536.100 and 536.140. In 1953 (Laws 1953, page 679), however, the Legislature amended Section 536.140, so that, as of now, its provisions to the extent here pertinent, as found in Sec. 536.140 RSMo 1949 Cum.Supp.1957, V.A.M.S., are:

"1. The court shall hear the case without a jury and, except as otherwise provided in subsection 4 of this section, shall hear it upon the petition and record filed as aforesaid.

"2. The inquiry may extend to a determination of whether the action of the agency

"(1) Is in violation of constitutional provisions;

"(2) Is in excess of the statutory authority or jurisdiction of the agency;

"(3) Is unsupported by competent and substantial evidence upon the whole record;

"(4) Is, for any other reason, unauthorized by law;

"(5) Is made upon unlawful procedure or without a fair trial;

"(6) Is arbitrary, capricious or unreasonable;

"(7) Involves an abuse of discretion.

The scope of judicial review in all contested cases, whether or not subject

to judicial review pursuant to sections 536.100 to 536.140, and in all cases in which judicial review of decisions of administrative officers or bodies, whether state or local, is now or may hereafter be provided by law, shall in all cases be at least as broad as the scope of judicial review provided for in subsection 2 of section 536.140; * * *."

(Subsections 3 and 4 deal with the review of orders not involving the exercise of administrative discretion and orders in specific classes of cases in which the court is or hereafter may be entitled to determine the facts for itself.)

"5. The court shall render judgment affirming, reversing, or modifying the agency's order, and may order the reconsideration of the case in the light of the court's opinion and judgment, and may order the agency to take such further action as it may be proper to require; but the court shall not substitute its discretion for discretion legally vested in the agency."

An analysis of the seven items of subsection 2, supra, considered in their entirety and in connection with the provision immediately following, reveals that, in substance, they set forth as necessary to judicial review of administrative orders and decisions both the elements defined in Article V, § 22, of the constitution and the requirement of Section 386.510 that public service commission cases be reviewed for the purpose of determining their reasonableness and lawfulness. Hence, it is clear that unless the additional clause in Section 386.510, providing that circuit courts in reviewing orders of the commission shall *try and determine them as suits in equity,* is intended to provide a broader scope of review than that fixed by Section 536.140, as amended in 1953, we shall have fully performed our judicial function when we determine whether the order here in question is supported by competent and substantial evidence upon the whole record (as required by Article V, § 22, of the Constitution) and whether it is reasonable and lawful (as additionally required by Sec. 386.-510). We, therefore, direct our attention to the clause in question.

That the commission is legally vested with the exclusive discretion (exercised within lawful bounds) of granting or refusing the application in the instant case is not open to question. In the Detroit-Chicago Motor Bus case, supra, 324 Mo. 270, 23 S.W.2d 115, 116–117, we said:

"The power to grant, or to refuse to grant, to a public utility a certificate of convenience and necessity is committed to the discretion of the Public Service Commission, within defined limits, and not to the circuit court or to this court. Respondent seeks to justify the judgment of the circuit court, reversing the commission's order and remanding the cause with instructions to grant the certificate applied for, on the ground that the action of the commission in making its finding and order was quasi judicial, and, that being true, a court of equity upon review was bound to affirm the order, set it aside, modify it, or to make one of its own, according to what it deemed right and equitable under the facts found by it. * * *

" * * * When an order is set aside, the court may remand the cause to the commission for such further action *as it may desire to take;* the court oversteps the boundaries of its jurisdiction when it attempts to tell the commission what the action should be."

Now, it simply cannot be true that a case can be *tried and determined* "as a suit in equity" by a court upon review when the court is not empowered, as is a court in equity, to determine and finally adjudicate the rights of the parties. To construe the clause in question to mean that on review the court should weigh and determine

the evidence de novo would nullify the provisions of Section 386.510, limiting review to determination of the reasonableness or lawfulness of the order and to affirmance or reversal and remand without direction. The meaning and purpose of the clause, as employed in the statute, is vague but it clearly is not intended to confer general equitable powers upon the reviewing court and we should no longer attach to it a meaning that tends to hinder rather than to effectuate the over-all remedial purpose of the act.

 When we consider the purpose of the public service commission act and the specialized functions therein conferred upon the commission, the reasons for limitations upon our power of review are apparent. The public service commission is essentially an agency of the Legislature and its powers are referable to the police power of the state. It is a fact-finding body, exclusively entrusted and charged by the Legislature to deal with and determine the specialized problems arising out of the operation of public utilities. It has a staff of technical and professional experts to aid it in the accomplishment of its statutory powers. Its supervision of the public utilities of this state is a continuing one and its orders and directives with regard to any phase of the operation of any utility are always subject to change to meet changing conditions, as the commission, in its discretion, may deem to be in the public interest. Courts of review perform no such function. They do not examine the record under review for the purpose of determining what order they would have made. As long as the commission acts in accord with due process of law and its findings and decisions do not run afoul of constitutional and statutory requirements and the inherent powers of the courts, it is engaged in an exercise of the police power of the state, with which it is not the province of the courts to interfere. It is, therefore, meaningfully stated in subsection 5 of Section 536.140, as amended in 1953, "the court shall not sub-

stitute its discretion for discretion legally vested in the agency."

 So it is that the judicial function neither requires nor justifies disregard of the findings of the commission. Those findings are prima facie correct under Section 386.270, and the complaining party carries the burden of making a convincing showing that they are not reasonable or lawful. Consequently, we are convinced and we hold that the clause in Section 386.510 stating that cases on review "shall be tried and determined as suits in equity", construed in the light of the over-all remedial purposes of the entire act, means no more than that when the court has determined whether an order or decision of the commission (made in the lawful exercise of its discretionary powers) is supported by competent and substantial evidence upon the whole record and is reasonable, or, as is sometimes conversely stated, whether it is arbitrary or capricious or is against the overwhelming weight of the evidence, the court has performed its whole duty. We turn to that duty.

The evidence adduced in behalf of the company consisted in the main of a series of exhibits, amplified by the oral testimony of certain of its employees. Protesting the application were the chambers of commerce of Eldon and Versailles and the communities of Cole Camp, Stover, Leeton, Ionia and Chilhowee. The record also shows that representatives of three Railroad Brotherhoods appeared. A comprehensive statement of the evidence received in behalf of both the company and protestants is required.

The company is a railroad corporation engaged as a common carrier of persons and property in interstate and intrastate commerce. Its system extends through several states, including Missouri. One of its lines, wholly in Missouri, extends a distance of 300 miles between St. Louis and Kansas City, upon which it operates freight trains in serving both of those cities and fifty or more intermediate points, among

which is Eldon, a division point, 164 miles from St. Louis and 136 miles from Kansas City. At sometime prior to the dates hereinafter mentioned, the company reduced its passenger train service between St. Louis and Kansas City to daily operation of westbound train No. 23 and eastbound train No. 24. In May, 1950, upon application of the company to entirely discontinue trains Nos. 23 and 24 between Belle and St. Louis and to discontinue their operation on Sundays between Belle and Kansas City, the commission authorized complete discontinuance of said trains between St. Louis and Belle and denied their discontinuance on Sundays between Belle and Kansas City. See Case No. 11,712, 2 Mo. P.S.C.(N.S.) 401. In May, 1954, upon application of the company to discontinue any operation of trains Nos. 23 and 24 between Belle and Kansas City, the commission authorized their discontinuance between Belle and Eldon but denied their discontinuance between Eldon and Kansas City. See Case No. 12,449, 5 Mo. P.S.C.(N.S.) 233.

In both of the former cases the principal protest against the discontinuance of said trains came from the operators of chicken hatcheries located between Eldon and Pleasant Hill, and especially a large concentration of those industries then (and now) in and around Windsor. The chicks produced by these hatcheries are placed in paper cartons and transported by parcel post. Prior to the filing of the first application, they were shipped on train No. 23 westward to and through Kansas City and on train No. 24 to and through St. Louis. Following hearing of the first application, the commission determined that public necessity for the operation of the trains between Belle and St. Louis no longer existed because (1) the company was sustaining a heavy loss in such operation and there was no indication of future improvement, (2) the chickens could and would be transported between Belle and St. Louis by trucks operated by the company's wholly owned subsidiary, the Rock Island Motor Transit Company, and (3) the passenger

patronage of the trains between Belle and St. Louis was negligible and the public was adequately served by other means of transportation; but the application to discontinue said trains between Belle and Kansas City on Sundays was denied because the evidence showed that Sunday was the day when the largest shipments of baby chicks were made. Upon the second application, the commission also denied discontinuance of the trains between Eldon and Kansas City principally because of the continuing necessity of their use in the transportation of baby chicks to and through Kansas City. The order, however, further stated that as "small as the passenger patronage may be, it would remain an unsatisfied need if the trains were discontinued."

In the application filed in the instant case, the company proposed that in the event trains 23 and 24 were discontinued between Eldon and Kansas City it would transport such chickens as were to be shipped between and including Eldon and Windsor during the months of February to June, inclusive, on all days of the week except Fridays, by means of a baggage car moving from Windsor to Kansas City by freight train picking up said car at Windsor in the afternoon and delivering it to the Union Station in Kansas City at or before 5:00 p. m.; that the baggage car used in such transportation would be equipped with electric fans, heated when necessary, and an employee would be in attendance on the car; that chickens moving by parcel post to and through Kansas City at stations between Windsor and Eldon, including Eldon, would be picked up by special ventilated motor trucks operated by the company's said subsidiary and transported to Windsor and loaded in the aforesaid baggage car to be operated from Windsor to Kansas City on each day of operation in time for transportation on the same day from Windsor to Kansas City in the baggage car; and that during said months and on said days said trucks would return to Eldon from Windsor and on the return trips the trucks would transport from Windsor and inter-

mediate stations any chicks that were offered for such transportation by parcel post or express. That proposal was submitted to the hatcheries and the post office department prior to the filing of the application and was agreed to by both the hatcheries and post office department as satisfactory.

The commission found that chicks and all other head-end cargo (mail, express, milk and baggage carried in the baggage and mail sections of the motor train) could be satisfactorily transported by the proposed substituted service and that the real and basic question was whether or not public convenience and necessity demanded the retention and operation of these trains for the transportation of passengers.

Train No. 24 is scheduled to leave Kansas City at 8 a. m., and to arrive at Eldon at 11:45 a. m. Train No. 23 is scheduled to leave Eldon at 2:00 p. m., and to arrive at Kansas City at 5:45 p. m. The schedule of Train No. 23 is designed to reach Kansas City in time to divert to trains leaving Kansas City that evening all chick shipments which the train has gathered enroute and are destined beyond Kansas City. Both of these trains normally are made up of Motorcar No. 9090 and a passenger coach. The motorcar contains the power unit, the Railway Post Office compartment and a baggage compartment. When the movement of baby chicks is heavy, it is at times necessary to add a baggage car to the train at Windsor, from which the most chicks are shipped.

The passenger equipment is antiquated. The train is not inviting for the general use of the public in passenger service and "We (the company) don't present it as such." The motorcar has been in the company's service since 1929 and is frequently withdrawn from service for overhaul and repair. When so withdrawn, a diesel engine is substituted for it. The train when powered by the motorcar requires a crew of three, but when the diesel is substituted a fireman is added. There is also a U. S. postal employee on said trains.

The population of the counties, excluding Jackson, through which the railroad runs is 93,105, and it is declining. The population of each of the communities served by trains 23 and 24 at which the company maintains open stations between Eldon and the environs of Kansas City is: Eldon 2766; Barnett, 200; Versailles, 1929; Stover, 693; Cole Camp, 813; Ionia, 120; Windsor, 2429; Leeton, 372; Chilhowee, 335; and Pleasant Hill, 2200. The population of each of the other communities at which the company has a station but no attendant is: Brandon, 10; Bowen, 30; New Castle, 3; Post Oak, 60; Denton, 40; Medford, 20; and Hadsell, 15. The average household within the environs of the stations above listed is approximately three persons and one passenger automobile is registered for every three (plus) persons within the area.

The passenger service of these trains for one year and ten months preceding March 31, 1956, has averaged per day for westbound passengers, 14, and for eastbound passengers, 15.9, for an average daily mileage per passenger of 77.6. The average daily revenue per passenger is $1.941, a total daily average revenue of $56.46. The average expense per day (train crew of motorcar operation) is $113.08. Of the revenue derived from the operation of these trains, during such period, about 25% was from passengers' patronage, which will be lost if these trains are discontinued, and about 75% was from U. S. mail and express for chick transportation, which would be retained if the trains are discontinued and the company's baggage car proposal is granted.

The revenues derived from the operation of these trains and the expenses incurred from the operation thereof for the year from June 1, 1954, to May 31, 1955, and for the ten months from June 1, 1955, to March 31, 1956, together with the net loss during each period, are as follows:

| Revenues | The 1 year | The 10 months |
|---|---|---|
| Passenger | $ 21,138.00 | $ 17,221.00 |
| Baggage | 78.00 | 63.00 |
| Mail | 38,653.00 * | 27,169.00 * |
| Express | 22,061.00 * | 16,186.00 * |
| Milk | 3,504.00 | 1,986.00 |
| Total revenue | $ 85,434.00 | $ 62,625.00 |

| Expenses | | |
|---|---|---|
| Diesel locomotive—repairs | $ 2,067.13 ** | $ 2,345.53 ** |
| Passenger train car repairs | | |
| (a) Motorcar power unit | 23,665.58 | 13,688.00 |
| (b) Other passenger cars | 7,382.61 ** | 6,030.15 ** |
| Wages, diesel enginemen | 18,139.46 | 16,186.34 |
| Train fuel | 19,007.12 | 16,678.32 |
| Water for train locomotives | 39.80 ** | 29.90 ** |
| Lubricants for train locomotives | 190.59 ** | 155.62 ** |
| Other supplies for train locomotives | 37.63 ** | 28.28 ** |
| Trainmen wages | 25,299.82 | 22,072.77 |
| Train supplies and expenses | | |
| (a–b) Passenger cars | 4,956.32 ** | 2,296.96 ** |
| (c) Motorcars | 2,718.16 ** | 1,973.00 ** |
| Damage to property | 1,110.60 | --- -- |
| Damage to livestock on right of way | 2,420.00 | 139.00 |
| Injuries to persons | 9,265.00 | 207.00 |
| Maintenance joint tracks | | |
| Yards and other facilities | 3,607.23 ** | 2,890.17 ** |
| Joint maintenance of equipment | 384.85 ** | 317.99 ** |
| Operating joint yards and terminals | 17,157.65 ** | 13,887.46 ** |
| Operating joint tracks and facilities | --- -- | 55.37 ** |
| General joint facilities | 437.19 ** | . 332.23 ** |
| Payroll Taxes | 5,325.71 | 3,787.54 |
| Total expenses | $143,212.45 | $103,101.63 |
| Net Loss *** | $ 57,778.45 | $ 40,476.63 |

* Revenue items marked are practically all derived from chick shipments.

** All expense items are actual amounts with the exception of those marked ** which items are prorated on the familiar mileage basis and therefore are estimates, but are fairly accurate.

*** The expenses shown in the foregoing chart are the out-of-pocket expenses of operating these trains and do not include the expenses on "the fully distributed basis" which includes a portion of such expenses as maintenance of way, bridges, trestles, culverts, buildings, etc., attributable to operating the line for both freight and passenger service. Including such, the loss for the one year would have been $123,637.30 instead of $57,778.45 and for the ten months would have been $88,320.32 instead of $40,476.63.

During the year beginning June 1, 1954, and ending May 31, 1955, the company had a net railway operating income for its combined freight and passenger service from Kansas City to Eldon of $231,761.66, producing a return of 2.75% on its investment cost and the appraised value of its land. For the same period, its system-wide net gain was $4,007,228.46.

It is estimated that each five-month period of the proposed substituted special chick shipment operations (in motor trucks and baggage cars as set forth in the application) would cost the company $5,760 for the operation of the baggage car, $1,618 for its maintenance and $2,000 in wages to the attendant thereon, as well as $6,830 for the operation of the special chick truck, a total cost of $16,208.

There is no continuous east-west bus service between Eldon and Kansas City. Eldon has daily bus service to and from Jefferson City, a point on the main line of the Missouri Pacific Railroad. Windsor has two buses to and one from Kansas City daily. Post Oak has three buses to and from Kansas City daily. Pleasant Hill, Greenwood and Raytown have seven buses to and four from Kansas City daily. Cole Camp and Ionia have bus service within four and two miles respectively. Versailles is about 17 miles and Stover is about 25 miles from Tipton, a point on the main line of the Missouri Pacific Railroad, and neither has any bus service whatever; and neither does Barnett, Leeton, Chilhowee, Wingate, Denton and Medford.

The average number of passengers boarding westbound train No. 23, between Eldon and Pleasant Hill, each day for the period beginning July 13, 1954, and ending May 31, 1956 (447 days), was: Eldon, 3.96; Barnett, .33; Versailles, 3.02; Stover, 1.28; Cole Camp, .64; Ionia, .16; Windsor, 2.52; Leeton, .33; Post Oak, .05; Chilhowee, .32; Wingate, .08; Denton, .02; Medford, .01; Pleasant Hill, .13. The daily average of passengers "off" east-

bound train No. 24 at these stations is slightly in excess of the figures above set forth.

The evidence in behalf of the protestants consisted principally of the oral testimony of eleven witnesses living within the area between Eldon and Stover. The substance of their testimony is hereinafter detailed.

Eldon has a pants factory employing an estimated 200 persons, a shoe factory employing an estimated 250 persons, a woodworking shop employing 10 or 12 persons; the Kraft Food Company has a plant there, and the Southwestern Bell Telephone Company employs about 90 persons in its telephone operations into the Lake of the Ozarks resort area. There has been a "lot of development in and around Eldon since 1950." Its biggest business, however, is tourist trade incidental to its location in the resort area. The Mayor of Eldon testified: He had not ridden trains 23 or 24 for two years, but did make trips to Kansas City, with which Eldon has considerable contact. Most people either drive their cars to Kansas City or go to Jefferson City and take the Missouri Pacific trains from there to Kansas City. It was his opinion that the type of the company's equipment had little to do with its lack of passenger patronage; rather was it due to the schedules of these trains. He believed that a train scheduled to afford the people of Eldon a shopping or business day in Kansas City, that is, a reverse of the schedules of these trains, would attract passengers.

A theatre owner from Eldon, president of the Eldon chamber of commerce, testified that he drove his car to Kansas City every ten days or two weeks and did not go on the Rock Island "on account of the service." If he could get a train into Kansas City and back on the same day he would use it. It was his judgment that other business men of Eldon, who now drive to Kansas City, would do the same thing.

The operator of a funeral service business at Versailles testified: He or some member of his firm ride these trains at least once a month to Kansas City, which takes three days. He would use them once a week if he could go and return to Kansas City on the same day. If the train schedules were reversed so as to afford a round trip to Kansas City each day, more persons would use them. A good many people make inquiry of the witness as to bus schedules to Tipton, which is 17 miles on hard-surfaced highway. There is taxicab service to Tipton, but its cost, $2.50 or $3.00, is prohibitive.

The president of the chamber of commerce at Versailles, who also operates a funeral service at Versailles and Stover, testified: As president of the chamber of commerce, he sees annually some 300 or 400 inquiries as to resort facilities in the Gravois area and 3 or 4 of them inquired as to the public service accommodation schedules or bus service. Some resort operators would be glad to meet the trains, but most resorts are operated by a man and his wife and the uncertainty of schedules makes it impossible for them to do so. Bodies received for burial are received at Sedalia, on the Missouri Pacific Railroad, not over the Rock Island. His business is such he could not use the train service. People generally go from Versailles to Kansas City by automobile. The chamber of commerce talk is that "if there was a decent schedule and decent service that in some cases we men would like to have train service to and from Kansas City"; he had no idea how many. He had not ridden Trains 23 and 24 since 1954, but some had said it was a horrible experience.

The postmaster at Stover testified: There was no public transportation from Stover within 20 miles other than the railroad. There is some passenger service on the Rock Island occasioned by non-residents visiting their kin in Stover, some go to Kansas City, and some work in Kansas City and return to Stover on weekends.

The operator of a trout hatchery at Gravois Mills, near the Lake of the Ozarks, testified: He shipped trout commercially by the Rock Island Railroad. It was a debatable question whether the trout could be successfully shipped by motor trucks. Up until a few years ago he had ridden Train 23 to Kansas City, but its equipment was uncomfortable and the delays enroute caused him to stop.

The executive director of the Lake of the Ozarks Association testified: The association is interested in the entire lake area. The tourist and vacationist business is the No. 1 industry, although there is a very small amount of manufacturing. The volume of tourist and vacationist business in 1955 was 1,850,000 persons, with an outlay of $42,400,000. His office annually received some 16,000 inquiries from prospective tourists, among which were inquiries for public service transportation, as the inquirers did not have cars. Of the 16,000 inquiries received, he would estimate 160 of them inquired as to public transportation facilities. There are resorts in the Gravois area of the Lake, as well as at Bagnell Dam, that go to the train to get vacationists. There are three American plan resorts on the "54 side" of the Lake and meals are available at other places from nearby restaurants.

The operator of a general store on Highway 5, 7½ miles south of Versailles, testified: He handled the advertising and publicity for some 80 resorts and motels and 36 business houses on the "Gravois Arm" of the Lake. Most people come there by automobile. All of the resort owners would gladly meet the trains at the railroad station. He had not ridden a Rock Island train since 1954, at which time it ran very late and the coach was deplorably dirty. His wife uses the train six or eight times a year. Connections on the Missouri Pacific are limited.

S. E. Gunn, an engineer on Trains 23 and 24, testified: The service was slow and the trains were sidetracked for freight trains. Sometimes he had to be "dragged in" on account of a hot engine and the motor car was frequently withdrawn from service for repairs. V. L. Haase, conductor on said trains, testified that up until about the 25th of June, 1956, the passenger coach was in a deplorable, "flophouse", condition, but it is now in good shape.

The report and order of the commission makes no mention of the suggestion of several of protestants' witnesses to the effect that more passengers might use the trains .if their operation were reversed to permit them to go to Kansas City in the morning so as to give them reasonable time for shopping and business and to return in the evening. That suggestion, however, was advanced at the hearing of the company's second application for discontinuance of these trains and held to be impracticable because the baby chicks shipped on a morning train would reach Kansas City at or before midday and would be required to remain in the yards for dispatch upon night trains, which would be very detrimental to them. 5 Mo. P.S.C.,N.S., 233, 247. In the instant case, it was also shown and it is not challenged that the reverse operation of the trains would be detrimental to the chicks, would not take care of the eastbound mail out of Kansas City, was unacceptable to the postal department and necessarily, therefore, would result in the loss of one of the company's chief sources of revenue from the operation of the trains.

Neither is there any contention made by the protestants nor suggestion made by the commission that passenger service could be supplied by the addition of a passenger coach to the company's freight trains operating between St. Louis and Kansas City. At the hearing on the company's second application, the commission found that · such a service would be unworkable for the reason that the useful-ness of the fast, through freight trains operated by the company on this line would be greatly impaired, if not destroyed, by such a procedure. 5 Mo.P.S.C.,N.S., 233, 247.

The prospect of any increase in passenger patronage of the company's trains was disposed of by the commission in words following:

"The sales and licensing of privately owned automobiles to citizens in the area served by these trains has steadily increased during the past few years, while populations therein have decreased slightly. The passenger patronage of these trains is declining. There are no resorts, vacation areas or other attractions on or near the route of these trains to attract much passenger patronage. Even the tourists and vacationists visiting the nearby Lake of the Ozarks area prefer to travel to and from such area in their automobiles in order to have them available for travel about the area."

The ultimate finding of the commission, insofar as it relates to the need for passenger service, is stated thus:

"In this case, at bar, there is no adequate available motorbus highway passenger service to absorb the passenger patronage of these trains.

"In addition to the passenger patronage, these trains have another very substantial source of revenue from the live chick shipments. Such shipments keep the operational losses within their present bounds instead of in a much higher amount. The public needs all of the services which the trains now render. Particularly, there still is a public need for the passenger service rendered by these trains. Their discontinuance would leave the public without an adequate replacement of the passenger service which the trains now render.

"It is our judgment and conclusion, upon the evidence given, that public convenience and necessity demands the retention and continuation of these trains in service.

"These trains are operating at a loss but this fact alone is no justification for an order permitting their discontinuance, if there is a public need for their continued operation, unless their continued operation would result in a confiscation of applicant's property or would become a burden on interstate commerce.

"The fact that the applicant's railroad system (and even this local line over a portion of which these trains operate) is operating at a profit, refutes applicant's pleas of confiscation and there was no proof that the operation of these trains is burdensome on interstate commerce."

■ Much has been written as to the factors determinative of the reasonableness of requiring continuance of a train service at a substantial loss. "[T]he character and population of the territory served, the public patronage, or lack of it, the facilities remaining, the expense of operation as compared with revenue from same, and the operations of the carrier as a whole" are said to be controlling criteria in solving the question. Atlantic Coast Line R. Co. v. Public Service Commission, D.C.S.C.1948, 77 F.Supp. 675, 684, and cases therein cited. Practically every case turns upon the weighing and evaluation of such of those factors as are involved. Of necessity, each case must be determined upon its own peculiar factual basis.

■ The courts seem uniformly to have taken judicial notice of the conditions existing within the last few years that have curtailed the business done by railroads, among which is the remarkable development of the modern highway systems, paced by a like development in motor vehi-

cle and aircraft transportation. The evidence in this case shows the company to be solvent and to be enjoying earnings in excess of expenses, both from its (Missouri) intrastate and its system-wide operations. It is, however, manifest that every railroad, if it is to remain solvent and avoid overcharging those in need of its services, not only has the right but the duty to seek discontinuance of all trains that show losses so disproportionate to the revenue received from their operation as to demonstrate that they are neither substantially needed nor used. See cases collected in Atlantic Coast Line R. Co. v. Public Service Commission of South Carolina, 77 F.Supp. 675, 686. In Chicago & N. W. Ry. Co. v. Michigan Public Service Commission, 329 Mich. 432, 45 N.W.2d 520, 529, it was said, "Where substantial losses result from the operation, the test to be applied is whether such economic waste outweighs any public benefit or convenience." In the recent (November, 1957) case of Texas and New Orleans Railroad Co. v. Louisiana Public Service Commission, 233 La. 787, 98 So.2d 189, 191, which involved an order of the public service commission denying discontinuance of certain passenger trains, the Supreme Court of Louisiana said: "* * * Secondly, even if the plaintiff company as a whole operates at a profit the losses occasioned by the passenger service in question is so out of proportion to the public demand and necessity therefor that a discontinuance is clearly warranted * * *." And in the more recent case of Atchison, Topeka & Santa Fe Ry. Co. v. State Corporation Commission, 322 P.2d 715, 725, the Supreme Court of Kansas, in holding unlawful and unreasonable an order of the commission refusing an application to discontinue certain passenger trains, said in the course of its opinion: "If the Company could be compelled to continue passenger service on a branch line simply because it was generally prosperous, a railroad would as a result of such logic stand committed to drain upon its income for costly and unnecessary service until complete

bankruptcy intervened. Public Service Comm. of State of N. Y. v. United States, D.C.1943, 50 F.Supp. 497, and see Chicago, B. & Q. R. Co. v. Illinois Commerce Commission, D.C.1949, 82 F.Supp. 368. Lest the foregoing statements be misconstrued, we hasten to add that in a proper case evidence of the total net revenue of an entire railroad system may be admitted and considered in the matter of the discontinuance of passenger service, depending on the facts and circumstances of the particular case before the Commission." See also St. Louis-San Francisco Railway Co. v. State of Oklahoma, Okl., 301 P.2d 228, 231.

We have not been cited nor have we found any recent appellate court case in this state that sheds much light upon the rule or test to be applied. In State ex rel. City of Carthage v. Public Service Commission, 303 Mo. 505, 260 S.W. 973, 978, it was said: "The preservation of a utility threatened with insolvency by losses from inadequate rates is no more an exercise of the police power than is like preservation from like losses from another source; i.e., the enforced operation of highly unprofitable and costly spur lines. The purpose in each case is to preserve the utility for the public use so far as in the circumstances may be done. The particular source of its losses is of no consequence."

In case No. 11,340, entitled "In the Matter of the Application of the Chicago, Burlington & Quincy Railroad Company for authority to discontinue", etc., 2 Mo.P.S.C. (N.S.) 219, 234, decided by our public service commission in 1949, one of the conclusions there reached was:

"The inference can be drawn, and the conclusion should be reached, that a public necessity for the particular service no longer exists, after there has been such an excessive reduction in the patronage of the service, resulting in heavy operational losses which are unreasonably disproportionate to the revenue received, as to warrant the conviction that the general public is no longer using, and reasonably supporting, the service. This rule should not be applied unless this excessive reduction in patronage has been so progressive and persistent in the nearby past as to indicate its constancy and unless there is no reasonable foundation for any expectation of an improvement of such distorted picture in the near future."

And in the first application made by the company to discontinue Trains 23 and 24 between St. Louis and Belle, 2 Mo.P.S.C. (N.S.) 401, 408, decided in 1950, it was the view of the commission:

"Where the total patronage of a particular train does not warrant its continued operation, we should not compel such continued operation in order to accommodate segments of patronage, even if some difficulty is to be encountered in finding substituted service."

There is authority from other states contrary to that above cited, Annotation, 10 A.L.R.2d 1121–1166, but we think the general rules above announced are sound and should be followed.

The essential facts are not in dispute. Admittedly, the company, for the year beginning June 1, 1954, in return for the passenger train service rendered by Trains 23 and 24, for which it incurred out-of-pocket expense in the sum of $143,212.45, received gross revenue in the sum of $85,434.00, thereby sustaining actual loss in the sum of $57,778.45. The succeeding ten-month period reveals a similar situation. The substituted service proposed by the company would materially reduce, if not wipe out, that annual loss.

Between Eldon and Pleasant Hill, both inclusive, there are only four stations that show a daily average of one or more persons boarding westbound Train 23, to wit: Eldon, 3.96; Versailles, 3.02; Stover, 1.28; and Windsor, 2.52. The remaining ten stations show a total daily average of 2.07 passengers boarding westbound Train No.

23, an average over-all of less than one passenger each four days. To the same effect is the daily average of passengers "off" eastbound Train 24 at the stations. Windsor has bus service to and from Kansas City and does not protest discontinuance of these trains. Eldon at some, but not extreme, inconvenience and expense has access to Missouri Pacific trains at Jefferson City. Moreover, the failure of Eldon to patronize these trains is due not to their equipment but primarily to their schedules, from which the evidence fails to show any possibility of relief. Versailles has no bus service. One witness says, "If there was a decent schedule and decent service * * * in some cases we men would like to have train service to and from Kansas City." But the wish of that witness means little in determining the issues here involved for the reason, as stated, the schedules cannot be reversed. Stover, with a daily average of 1.28 westbound passengers, has no bus service and the postmaster says that some use is, and, inferentially, would be, made of the trains if continued.

 These facts show that, with the exception of Versailles and Stover, comparatively little expense and inconvenience will result to the general public heretofore served by these trains if they are discontinued under the plan proposed, and that the citizens of Versailles and Stover, which together have heretofore averaged 4.30 westbound passengers per day, will lose their only direct access to public transportation to and from Kansas City. The demand for passenger service in the area served by these trains is declining and there is no hope for its improvement. The resort area surrounding the Lake of the Ozarks affords practically no demand for passenger service on trains. It is reasonable to assume that the demand for such service will become even less than it was when this case was decided by the commission in October, 1956. A reconsideration of the matter in the light of developments subsequent to that time, if the commission, in its discretion, should deem such a course advisable, might prove of value in any future determination of the problem. However that may be, the foregoing facts convince us the losses being sustained by the company in the operation of Trains 23 and 24, as of October, 1956, were so patently disproportionate to the public convenience and necessity then or thereafter to be served by them as to render the order that they be continued unreasonable and arbitrary within the meaning of the public service commission statutes.

The judgment of the trial court is reversed and remanded with directions to the trial court to set aside the report and order herein reviewed and to remand the cause to the Public Service Commission for its further consideration.

All concur.

