STATE of Missouri ex rel. CHICAGO, ROCK ISLAND AND PACIFIC RAIL-ROAD COMPANY, Respondent,

v.

PUBLIC SERVICE COMMISSION of State of Missouri, Appellant.

No. 47574.

Supreme Court of Missouri,

En Banc.

April 11, 1960.

Rehearing Denied May 9, 1960.

Glenn D. Evans, Gen. Counsel, Thomas J. Downey, Asst. Gen. Counsel, Missouri Public Service Commission, Jefferson City, for appellant, Harry H. Kay, Eldon, of counsel.

O. L. Houts, Chicago, Ill., Hale Houts, Hogsett, Houts, James, Randall & Hogsett, Kansas City, for respondent Chicago, R. I. and P. Ry. Co.

EAGER, Judge.

This is a second appeal in proceedings in which the Chicago, Rock Island and Pacific Railroad Company (which we shall usually refer to as "the company") applied to the Public Service Commission for authority to discontinue local passenger trains 23 and 24 operating between Eldon and Kansas City, Missouri. Our prior opinion appears at Mo., 312 S.W.2d 791. We held there that the order of the Commission requiring the continued operation of the trains was unreasonable and arbitrary, but ordered the case remanded for further consideration. The evidence in that case concerned the operation of the trains for the period from June 1, 1954 to March 31, 1956. After remand, the Commission held a hearing on June 10, 1958, and on July 17, 1958, it entered an order again denying the company's application and ordering rehabilitation of the service. From that order and all subsequent orders, including the one now under consideration, Commissioners Burton and Henson dissented. The order of July 17 was set aside on motion for rehearing, and a new hearing was held on September 17 and 18, 1958, after full notice to the various interested parties, attorneys and organizations. Following that hearing and on December 29, 1958, the Commission (on a 3–2 vote) entered the present Report and Order, again denying the application and ordering rehabilitation. References will be made in this opinion to various parts of that document; it consists of forty-one pages and it will be impossible to digest it in detail. On certiorari the Circuit Court of Cole County set aside the Report and Order and thereafter declined to enter a stay of its judgment pending this appeal. The Commission and various Intervenors have appealed.

We look to our prior opinion for an analysis of the facts from the initial hearing. We shall occasionally refer to the "prior record," meaning the one upon which our opinion was based. That opin-

ion is the law of the case, except as the facts may now be substantially different. State ex rel. Anderson Motor Service Co. v. Public Service Commission, 348 Mo. 613, 154 S.W.2d 777, adopting majority opinion in 234 Mo.App. 470, 134 S.W.2d 1069. At the present hearings the entire former transcript and all exhibits were received in evidence. We shall review from the later hearings only such facts as have been offered to show a change in conditions. As before, the evidence is based largely on exhibits; the period of operations covered by most of the present exhibits is from April 1, 1956, to March 31, 1958; some supplemental figures on passenger patronage are furnished into September 1958. Much of the evidence (as previously) concerned the number of passengers riding these trains. Train No. 24 leaves Kansas City at 8:00 a.m. and arrives at Eldon, 136 miles east, and 11:45 a. m.; on the return trip (as Train No. 23) it leaves Eldon at 2:00 p. m. and arrives in Kansas City at 5:45 p.m. These are the scheduled hours. Generally, the route is through Pleasant Hill, Chilhowee, Windsor, Cole Camp, Stover and Versailles, but there are other smaller communities on the line. During the period of 22 months covered by the prior record the average number of passengers per day going west was 14, and the average per day going east was 15.9; (312 S.W.2d loc. cit. 798); the average daily mileage per passenger was 77.6; the average daily crew expense (motor car operation) was $113.08; the revenue per train mile was $.812 and the loss per train mile was $.539. The last two items are supplied by exhibits now before us. Approximately 25% of the revenue of the trains was then and is now from passengers, the balance coming largely from mail and express, including baby chick shipments. The present record shows that, for the two year period from April 1, 1956, to March 31, 1958, the average daily number of passengers going west was 13.2, and the average daily number going east was 13.7. Both of these figures

are decreases from the prior 22 month period. For the same period the daily mileage per passenger was 77.3 (down slightly), the average daily crew expense was $123.81, the revenue per train mile $.76, and the loss per train mile $.55. Clearly, these figures demonstrate a slightly increasing loss during that period, rather than a gain. However, the Commission stresses the fact that on the company's own figures, as corroborated to some extent by figures kept by two protesting conductors, the passenger traffic increased in the first full six months of 1958 as compared with 1957, and also during July, August and September, 1958. We do not have comparative figures for July, August and September, 1957. For the first six months of 1957 the average number of passengers going east was 13.1 and going west, 11.5; for 1958, it was 12.1, and 14.4, respectively. One 1958 figure is thus less than that shown in our prior opinion for the full 22 month period, and the other is .4 more. The east bound passenger average decreased in 1958 (first 6 months) over 1957, and the west bound increased by 2.9 passengers. It was shown that in 1958 the Missouri Pacific had ceased to run its afternoon passenger train from the south beyond Pleasant Hill, and that a few passengers transferred there to this Rock Island train, rather than wait for the next Missouri Pacific into Kansas City about two hours later. The Rock Island honored their tickets and billed the Missouri Pacific. This slight increase was not from traffic originating in communities along the Rock Island, for which the Commission is seeking to require service. While we do not take judicial notice of newspaper reports, and do not rely upon the point here in any event, we note that the White River Run of the Missouri Pacific (from which these transfers at Pleasant Hill emanated) was discontinued entirely on March 21, 1960. The protesting conductors' individual reports indicated greater passenger numbers in June, July and August, 1958, than in the prior months of 1958, but we have no suitable means

of comparison with prior years, and generally, the summer traffic appears to have been somewhat greater. The Commission states that one conductor's figures (each ran one half the total days), averaged for 22 days 16.1 passengers going east and 25.3 passengers going west. The exhibit contained no average, but we accept the computation; it covered only a period from August 5–September 15, 1958. The summer increases were accounted for in part by the fact that beginning in 1955 the YMCA in Kansas City had patronized these trains several times each summer for the transportation of groups of boys (and perhaps others) to a summer camp located south of Versailles. The Commission estimated in its present report that the trains had carried 177 such persons (largely on one-half fare) during the summer of 1958 on the round trip between Kansas City and Versailles. This situation likewise existed during the period covered by our prior opinion. The exhibits indicate that generally the passenger traffic improved somewhat in the summer months, and that it did so in 1958.

The present application seeks to make no change in any phase of the freight traffic. The company has again tendered a substitute service as it did previously (312 S.W.2d loc. cit. 797) for the transportation of the very large volume of baby chick shipments from stations along the line to Kansas City, where various connections are made. This is an industry vital to parts of this region. These chicks are shipped by parcel post and express, largely by the former. The service thus offered appears to be entirely satisfactory to the hatcheries, as indicated by their counsel at the time of the last hearing. This service would consist of furnishing one or more baggage cars, heated, ventilated and attended, to be attached to freight trains running on schedules suitable to the shippers. The Post Office Department appears also to have approved.

Both of the trains involved here consist generally of motor car No. 9090 and a passenger coach; the motor car contains the power unit, a 15 foot Railway Post Office, and a baggage compartment. From February–June, inclusive, it is very frequently necessary to add a baggage car for the chicken shipments, and on those occasions a diesel locomotive is substituted and an extra crew member required. These circumstances are identical with those described for the prior period. There was testimony here by a Commission employee concerning the outmoded equipment, the disrepair and supposed uncleanliness of the passenger coach; this evidence was controverted to some extent, but we shall not dwell upon the issue. The condition is not substantially different now from that existing at the time of the prior hearing.

In our prior opinion at 312 S.W.2d loc. cit. 799 appears the table of revenues and expenses on these trains over a 22 month period. The net loss shown there was $57,778.45 for a one year period and $40,476.63 for a 10 month period. An exhibit of the company here demonstrates a loss of $111,717.44 for a 24 month period ending March 31, 1958 (adjusted for two errors shown in the evidence as recognized by the Commission). It is obvious that the current loss is proportionately greater than that for the earlier period. The Commission and the "protestants" have made no effort to attack the correctness of the figures or the computations as such. The Commission sent a representative to Chicago in advance of the hearing and he checked the company's books and records. They do make certain arguments about the possible reduction of expenses and losses which we shall mention later. We find it unnecessary to set out the present exhibit. The passenger revenue is $41,109 of a total revenue of $151,350. The claim expense for injuries and damage to persons and property is only $1,700.60 as compared with $13,131.60 previously; wages are up substantially, approximately $475 per month. The Commission points to the fact that the total revenue from these trains for the

first six months of 1958 was $41,293.75, as compared to $37,563 in the comparable period of 1957, or a $3,730.75 increase. This was more than offset by an increase in direct expense of $4,414.76 for the same period, and we note also that of the revenue increase only $828 was in passenger business, the balance of the increase being entirely from carrying mail. In the expense figures nothing has been included for maintenance of way, taxes, overhead, or other general expense. Complaint is made of some of the expenses charged at the Kansas City Terminal for maintenance and operations; those items were shown to be direct charges against these two trains, which would cease if the trains were discontinued. The Terminal Railway is a joint, co-operative undertaking; if these trains are discontinued the total costs incurred by the Terminal would still be apportioned among all the participating roads, but the evidence here showed without controversy that the Rock Island would save more than 95% of the costs now charged directly against these trains. We consider these items to be a proper expense, as shown. This same condition was also present in the prior hearing. The Commission furnishes a copy of an Interstate Commerce Commission decision involving an application for the discontinuance of a Louisville and Nashville train between Bowling Green, Kentucky, and Memphis Tennessee. There certain terminal expenses at Memphis were disallowed on the ground that the total of the Terminal costs would be reapportioned between all participating roads, thus shifting that item to other roads, but that thereby "the total burden upon *interstate and foreign commerce* would not be materially lessened" (emphasis ours). We have no such question here and the citation is wholly inapplicable.

At several places in its Report and Order the Commission refers to the fact that the loss sustained on these trains is negligible when considered in connection with the company's system-wide operations, and that it is and has been operating at an over-all profit. The system-wide profit in 1957 was 2.65%, in 1956, 3.87%, and in 1955, 3.89%, decreasing each year. The company has consistently sustained a loss on its system-wide passenger business and on its total passenger business in Missouri. Its total passenger deficit in 1957 was $20,547,315 and its deficit for Missouri operations was $2,146,792. Both deficits have been gradually but steadily increasing for several years. We held in our prior opinion that the continued operation of these trains might not be required because of the fact there was a system-wide profit, although "in a proper case," [312 S.W.2d. 804] such evidence might be considered. In part we said, at 312 S.W.2d loc. cit. 803 (citing authority): "It is, however, manifest that every railroad, if it is to remain solvent and avoid overcharging those in need of its services, not only has the right but the duty to seek discontinuance of all trains that show losses so disproportionate to the revenue received from their operation as to demonstrate that they are neither substantially needed nor used." In a proceeding for the discontinuance of these same trains between Kansas City and Belle, Missouri (application granted in part), our Commission said in 1950, as reported in 2 Mo. P.S.C. (N.S.) at page 407: "The fact that the railroad is making a profit on its system as a whole does not constitute grounds for the refusal of permission to discontinue particular trains which are operating at a loss. As we said in the Burlington case, 'the operation of non-paying trains should not be compelled in order to serve the convenience of the few who use them and thereby consume the profits, if any, of the paying trains, including freight trains operated elsewhere on the system, otherwise in a few years the railroad would become worthless.' Under the federal and state constitutions, a railroad has the right to earn a fair return upon its property devoted to public use.

"It is to be concluded that public necessity for a particular service no longer exists when the patronage of the service has been so reduced as to result in heavy operational losses unreasonably disproportionate to the revenue received." The fact that the company has shown a modest system-wide profit is certainly not a controlling factor here.

The correctness of the figures in the loss computations of the company here was not really questioned. Rather, the Commission insists: (a) that the losses shown are not the actual losses because the company is paying an overall 52% income tax against which this loss is applied as a credit; and that the loss shown should therefore be reduced by 52%; (b) that possibly the loss could be reduced by negotiating with the Brotherhood of Railroad Trainmen for the elimination of a brakeman; and (c) that the trains could be operated at a smaller loss by the substitution of a "Budd car" for the present equipment. We shall discuss these contentions in that order. The income tax question was available in the prior proceeding. We do not find that this argument was made, but piecemeal submissions are not favored, and we consider the point as already adjudicated. Moreover, when we are considering an out-of-pocket loss on such an operation as this, with no expense added for proportionate maintenance of way, ad valorem taxes, office expense or general overhead, we do not think that a consideration of income taxes is proper. No one can tell what the loss here would be if a suitable part of such items of general expense were apportioned to these trains. And if the system-wide profit is not a material consideration here, as we have already held, then the income tax argument is automatically eliminated. The income tax is a part of the general expense of the company. It is not to be applied or considered here. The possibility of labor negotiations is advanced because of the following provision in a 1956 supplement to the contract with the Brotherhood of Railroad Trainmen: "(5) A one unit motor car carrying passengers or a RDC (Budd) car will not be considered as a 'passenger train' and will not require assignment of a trainman under this agreement. Budd cars composed of more than one unit or hauling a trailer will have at least one trainman.

"(6) Except for the substitution of a one unit motor car or Budd car for an existing passenger train, no reduction in the number of trainmen will be made in present crew consist nor in present understandings covering crew consist in either passenger, freight or work train service until a proper check has been made by and between the proper company officers and chairmen. Any change in crew consist made will be after negotiations and agreement on the basis of such check." The Commission asserts that it is entirely possible that the Brotherhood might agree to take off the trainman now required because a passenger coach is attached to the motor car. It is asserted that an item of $13,075.42 might thereby be saved; the proof of the amount is somewhat sketchy, but that is immaterial in the view we take. We know judicially that some effort has recently been made to increase train crew numbers. (See Missouri House Bill 381, 1959 Assembly, which seemingly would have required a total crew of five men even on a single unit motor car.) Mr. Johnson, Vice-President in charge of operations for the company, testified that no such negotiations had been had here, but when he attempted to relate the company's past experience in such matters, counsel for the Commission stated that he was not interested in the past experience. Later, on cross-examination by a Commissioner, Mr. Johnson stated that the company had never to his knowledge been successful in decreasing a crew "consist," and that the present agreement dispensing with a brakeman on a one car unit (such as a Budd car) was only negotiated by giving a contemporaneous agreement requiring two brakemen on trains of more than six cars (as shown by

the exhibit just referred to). The trainmen are the only Brotherhood who would be interested in such a suggested negotiation, and it would be less than realistic to suppose that they would agree to eliminate their only brakeman; their representative was present at the hearing but he made no suggestions and took no part. This argument deals in pure speculation, and it is not of sufficient substantiality to affect the result in any way.

■ Counsel for the Commission adduced much evidence concerning possible savings to be accomplished by the use of a "Budd car" as a substitute for the present equipment. These cars, manufactured in Philadelphia on special order, consist of a power unit, small baggage space, an RPO post office (if desired) and a passenger compartment. The cost of one would be slightly in excess of $180,000, and delivery would take about one year. Mr. Johnson testified that he could not justify the expenditure of such an amount for service on this line. The company has five such cars in operation, two between Kansas City and Fort Worth, and three between Memphis and Tucumcari, New Mexico. Those were purchased to replace expensive diesel locomotives and streamlined cars which were profitably transferred and used elsewhere, thus avoiding the purchase of other equipment. There was much discussion, pro and con, as to whether a Budd car could pull another car, referred to as a "trailer." The cars were doing so on certain parts of the Memphis-Tucumcari run, but one or more company witnesses expressed the firm opinion that the practice would not be successful on this line because of the many stops and the grades. The car is a high speed car, and it was said that the greater stress of many stops and starts would tend to damage the equipment. The maker's one year warranty is immediately voided if a trailer is used. One trailer would frequently be necessary here for the chick traffic, two would be required at times; all apparently agreed that the Budd car could not pull two trailers. The only substantial evidence in this record is that the Budd car could not successfully (and without damage) pull one trailer. Exhibits received in evidence showed the estimated revenues and expense in the assumed operation of a Budd car for the year 1957 (a) without a trailer and (b) with a trailer. The revenue figures were taken from computations already in evidence. The estimated losses shown were, (a) $46,805.94, and (b) $31,397.09. These estimates contemplated the use of an ordinary diesel locomotive where necessary, a reduced crew when the Budd car operated alone, and decreased repair items for the new equipment. An additional exhibit showed the estimated cost of that operation with the proposed substituted service for chickens by baggage cars attached to freight trains; the loss on that was estimated at $62,030.62 for the year. Counsel for the Commission insist here that these figures are not realistic because the company has included in the expenses an item of depreciation of $6,563 and an item of return on investment at 5½% ($9,944); and, further, that with these items eliminated the losses would be very materially reduced. No depreciation is being taken on the present equipment for it has been fully depreciated. We see no reason why the company should not be allowed the benefit of a reasonable depreciation in passing upon a requirement for the purchase of new equipment, and at least one Commissioner was apparently of that opinion at a pre-trial hearing, saying: "You would have 4% depreciation * * *." The transcript of the pre-trial was rejected when offered in evidence later but we hold that it is a proper part of our record. See, also, generally, for a consideration of depreciation as an element, State ex rel. Ozark Power & Water Co. v. Public Service Commission, 287 Mo. 522, 229 S.W. 782, 786. But we need not quibble over these two items for we rule the question on a broader principle. It is wholly unreasonable to require or expect this company to make a capital expenditure in excess of $180,000 on such a losing proposi-

tion as these trains have been demonstrated to be. True, the Commission has not ordered this purchase, but it has ordered "rehabilitation" and the prodding for the substitution of a Budd car operation runs through this record like the chorus of a song. The Budd car operation would reduce somewhat the item of repairs and certain terminal charges; "trainmen wages" would also be reduced. But without substantial increases in revenue there would still be a very substantial loss. The five Budd cars now owned by the company are all in regular use elsewhere. The purchase of such a car here would not release any valuable equipment for use elsewhere. There is no reasonable prospect that passenger traffic would be increased by the purchase, and there is a definite probability that the Railway Post Office would be lost to truck transportation or "Star Routes" which now enmesh the area and furnish cheaper mail service; the income from the mail service alone has constituted nearly half of the total revenue. In case No. 13,769, In re Application of MKT Railroad Company for the discontinuance of certain passenger trains, our Commission said: "In our opinion it would be unreasonable to cause the Applicant to increase the investment or the cost by requiring the use of up to date equipment for a trial period or experimental use with so little demand for passenger service." We so hold here. And in No. 13,907, In re Application of St. Louis-San Francisco Railway Co. for the discontinuance of certain trains, the Commission said: "Various reasons are given for not riding the trains but the best and most plausible reason is that private automobiles, public buses and airplanes have become the principal methods used by the public in traveling from place to place. It will be conceded that deluxe train service is desired but reflecting back over the years when passenger trains with pullmans and diners were giving good service the public left them for other modes of transportation. Therefore, with due regard to the opinions expressed that more people would ride the trains if modern facilities and better service were furnished, the Commission is of the opinion that on this particular run between St. Louis and the Missouri-Arkansas State Line, or between St. Louis and Memphis, very few additional riders would use these night trains even with a streamlined train having diner facilities."

We note here that from November 1, 1956, to the time of the last hearing (September 17–18, 1958) wage increases from contract escalator clauses and the cost of living index had totaled approximately $.31 cents an hour for all operating Brotherhoods, with an added increase of 7–8 cents an hour (plus a new review of the cost of living index) scheduled for November 1, 1958. One must necessarily take a dim view of any future reduction in expenses generally. The schedules of these trains cannot be reversed to better accommodate passengers, as has been suggested, for this would be wholly unsatisfactory to the hatcheries which furnish much of the existing revenue. We are surprised to note the following suggestion in the Commission's Report and Order: "If the train schedules were changed to accommodate the passsenger needs of people going from Eldon to Kansas City and return the same day with time in Kansas City to attend to business, visit relatives or participate in other cultural activities or visit museums, United States mail service will use the train service available until complaints are lodged with the postal authorities." The Commission took a contrary view regarding these same trains at 5 Mo. P.S.C. (N.S.) 233, 247. And in that proceeding, where the Commission in 1954 permitted the discontinuance of these trains between Belle and Eldon but ordered them continued between Eldon and Kansas City, the Commission was much concerned with continued service and schedules satisfactory to the hatcheries which then and now constitute so vital a part of the industry of the area. That element has now been satisfactorily taken care of in the substituted service offered.

The matter of bus service and other available public transportation was fully considered and discussed in our prior opinion. The situation is not shown to be materially different now. There were only two communities of any substantial size on this line which did not have any bus service (312 S.W.2d loc. cit. 800), and they are, respectively, 17 and 25 miles from the Missouri Pacific. The line of the Missouri Pacific, with adequate and frequent passenger trains between Kansas City and St. Louis, is not more than 32 miles from any station on this line. The Commission has so stated (5 Mo. P.S.C. (N.S.) 233, 239).

■ The supposed differences between the actual facts in the present record and those in the prior record are wholly insubstantial. For instance, the Commission asserts that during the first six months of 1958 these trains carried "an average of 1.9 more passengers * * * per day * * * than for the same period in 1957." The difference is obviously trivial. This increase, we note, occurred while expenses were advancing materially. And the slight increase was apparently due entirely to the transfer of passengers at Pleasant Hill from the Missouri Pacific for a ride of forty miles, a condition which (if we may believe the news reports) ceased to exist on March 21, 1960. The use of the trains for the YMCA camp is also of an uncertain nature; one or more groups used other transportation in 1958, charter bus service is available, and many of the persons use private transportation now. The same user existed in 1955, during the period of our prior consideration. The reconsideration here by the Commission has resulted merely in new and additional arguments and theories based on substantially identical facts.

■■ In our prior opinion we held that the losses being sustained were disproportionate to the need for passenger service saying, in part, at 312 S.W.2d loc. cit. 805: "The resort area surrounding the Lake of the Ozarks affords practically no demand for passenger service on trains. It is reasonable to assume that the demand for such service will become even less than it was when this case was decided by the commission in October, 1956. A reconsideration of the matter in the light of developments subsequent to that time, if the commission, in its discretion, should deem such a course advisable, might prove of value in any future determination of the problem. However that may be, the foregoing facts convince us the losses being sustained by the company in the operation of Trains 23 and 24, as of October, 1956, were so patently disproportionate to the public convenience and necessity then or thereafter to be served by them as to render the order that they be continued unreasonable and arbitrary within the meaning of the public service commission statutes." The majority of the Commission now finds that the losses being sustained are subject to adjustment by some or all of the various theories and methods advanced, and that the public need for this passenger service is an overriding factor. It also finds that "it has jurisdiction to pass upon the weight of the evidence in deciding which of the two factors is paramount." As already stated, we find no substantial change in the basic and material facts in the present record. The "hope" of improvement expressed in the Report and Order is more ethereal than real. Another hearing was suggested by us with the thought that really different facts might perhaps be found; this suggestion was not made for the purpose of permitting an evasion of the effect of our opinion by developing new theories and arguments on the same facts. If the former order of the Commission was unreasonable and arbitrary, the present one is doubly so. Two members of the Commission recognized that, in stating: "After having made this review we are not convinced that the additional evidence offered at the June and September hearings has been sufficient to remove the elements of unreasonableness or arbitrariness which the Court held existed in the October 26, 1956

Order." The facts being substantially the same, our prior opinion is the law of the case. State ex rel. Byers Transportation Co., Inc. v. Public Service Commission, Mo. App., 180 S.W.2d 259. And our prior opinion controls here. There remains now no room for any further discretion to be exercised by the Commission on these facts, despite the usual rule of deference recognized in such cases as State ex rel. Anderson Motor Service Co. v. Public Service Commission, 348 Mo. 613, 154 S.W.2d 777 (adopting opinion in 234 Mo.App. 470, 134 S.W.2d 1069, loc. cit. 1076), and in our former opinion in this case. We are given the power and the duty to review administrative decisions (Art. 5, Sec. 22, Mo. Constitution, V.A.M.S., and statutes adopted thereunder, Ch. 536, V.A.M.S.). The Circuit Court, and this court on appeal, is specifically given the power and duty to determine "the reasonableness or lawfulness" of Public Service Commission orders and decisions (§ 386.510 V.A.M.S.). Upon such review the court shall affirm or set aside the order, and "may, in its discretion, remand any cause which is reversed by it to the commission for further action." The Circuit Court here set the order aside, without remand. In State ex rel. Byers Transportation, Inc., supra, the court said, 180 S.W.2d loc. cit. 263: "If, upon another hearing, additional testimony was introduced proving a substantially different set of facts, then the Commission could, and should, make its findings and order based upon the new facts and conditions. But if there was no substantial difference, then the Commission could not re-enter the same order which a court of competent jurisdiction had declared unlawful and unreasonable. If that was not the law, then the courts would have no supervision or control over the actions of administrative bodies."

Under these circumstances, we modify the judgment of the Circuit Court in this, to-wit: that the Report and Order of the Commission be and it is set aside; the cause is remanded to the Commission so that it may enter an order in conformity with this opinion, but not for the purpose of a further hearing; and therein the Commission may make suitable provisions requiring the furnishing of the substituted service for the handling of shipments of chickens as heretofore tendered in these proceedings. As so modified the judgment is affirmed.

All concur.

On Motion for Reargument

PER CURIAM.

The Commission has filed a motion for rehearing. We find nothing essentially meritorious in it, and it is overruled. Respondent has filed a motion seeking a modification of our opinion; specifically, it asks that the judgment of the Circuit Court be affirmed and that all provisions for remand to the Commission be eliminated. The motion is based upon the following asserted facts: that after the end of the 1959 baby chick season the Post Office Department completely changed the method of handling the parcel post shipments; that they are now transported by Star Route on trucks to points on the Missouri Pacific, the St. Louis-San Francisco Railway, and perhaps elsewhere; that in any event no mail shipments are now delivered to Respondent, that its previous offer of substituted service has been rendered entirely unnecessary, and that no further order of the Commission is necessary. It states, however, that some express shipments of chicks are still being handled by it in ventilated trucks, and it concedes that this is a "common carrier duty." It asserts: that this service as now rendered by it is adequate and that there are no complaints; that the Commission would have no jurisdiction to interfere in the parcel post movements; and that there is no occasion for a remand or for any order of the Commission.

The Commission has filed suggestions in opposition to this motion and it asserts that

the services now being rendered on the chick shipments are wholly unsatisfactory to the hatcheries; it attaches a document showing specific and substantial complaints by various hatcheries. We are not in position to determine whether the dissatisfaction involves the parcel post shipments alone, or all truck shipments. The Commission also questions that the Post Office Department has voluntarily occupied the parcel post field with the truck shipments. In these circumstances the order of remand will stand; this, for the purpose of making such order, if any, as may seem proper in connection with the chick shipments as indicated in our original opinion, and in the light of subsequent developments. This need not involve any interference with the Post Office Department. The motion to modify is overruled.